

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-22-00170-CR

———————————————

MUHAMMAD FAIZAN ANSARI, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 372nd District Court
Tarrant County, Texas
Trial Court No. 1629392R

Before Birdwell and Bassel, JJ.; and Lee Gabriel (Senior Justice, Retired,
Sitting by Assignment)
Memorandum Opinion by Justice Gabriel

# MEMORANDUM OPINION

A jury convicted Muhammad Faizan Ansari of two counts of online solicitation of a minor. *See* Tex. Penal Code Ann. § 33.021(f). The trial court assessed his punishment at ten years' confinement on each count, suspended the sentences, and placed him on community supervision for ten years. *See id.* § 12.33. The trial court also assessed a fine of $2,000 on count one. Payment of the fine was not suspended. In his first point, Ansari contends that the electronic messages allegedly sent between him and the fictitious child victim were not properly authenticated and were thus improperly admitted. In his second point, Ansari seems to argue that if the messages had not been admitted, the evidence would have been insufficient to support his conviction. We affirm.

## I. BACKGROUND

In 2018, Detective William Maddox worked in the internet crimes unit of the Fort Worth Police Department. He exclusively investigated crimes involving child victims by focusing on offenses that had an internet or technological component to them. He described his specialized training for the job:

> I have training on . . . understanding how the internet works, what an IP address is, the different platforms that are used for online communication[,] and how they relate to crimes against children; training on engaging in undercover chat operations where we will pose as somebody else online and look for offenders online; training in peer-to-peer file-sharing networks where users are sending files to each other via the internet; and other training related to how technology is used to engage in crimes against children.

He furthered explained that an IP address means an Internet Protocol, which he analogized to the physical address of a house. "[T]o engage in communication online, you have to report what your address is to whatever the source online is that you're looking at so that they know who you are, where you are[,] and how to send information back to you."

Maddox explained that he also received specialized training in undercover investigations that would target online-solicitation-of-a-minor and child-pornography cases. He detailed how he developed a persona where he posed as a thirteen-year-old girl. He also explained how his unit had a limited amount of photographs of real children that were donated for use in these types of investigations. These photographs were not sexual in any way. Maddox testified that he conducted operations targeting online solicitors by posting an ad on a platform that children commonly use, which then remained idle until somebody responded.

Maddox testified that on March 13, 2018, he posted an ad on Craigslist, a classified-ads website, using the name "Emily"—the thirteen-year-old-girl persona Maddox used—that stated, "Contact information: Young and needing something to do, W4M.[1] Mom is out of town and friends went on trips for spring break. I'm booooooooored." The first response to the ad came in within twenty minutes from a Craigslist anonymized email address with a username of "Faizan." The response

---

[1]He explained that "W4M" means "Woman for Man."

3

arrived in the inbox of an email account that Maddox created and linked to the ad. "Faizan" and "Emily" then communicated by emails that only they could see.

In the very first email "Faizan" sent to "Emily," he asked if she was alone and offered to come and "give [her] company." In her very first reply, "Emily" asked "Faizan" if it was okay that she was only thirteen years old. "Faizan" responded, "Yeah. . . . I was looking for someone like you." "Faizan" sent "Emily" a picture of himself. He described himself as twenty-five, 5'8", and athletic. He asked "Emily" to send him multiple pictures of her, and Maddox sent the pictures. In the exchange, "Emily" asked "Faizan" what he wanted to do. "Faizan" responded, "Well, [w]e can make out and [c]uddle and see where it goes." "Emily" followed up by asking him where he thought it would go. "Faizan" replied,

> It will definately [sic] go far lol. . . . I'll have [y]ou sit on my lap. We can start with a long kiss [a]nd making out while feeling each other[′s] bodies. I'll start going down on you kissing all over then might lick it if you like . . . and then . . [.] a lot more.

"Emily" then told "Faizan" that she had never done the acts he was describing before, and he responded that he would show her when they met. He said he was available to meet her that day.

Maddox testified that "Emily" and "Faizan" exchanged approximately twenty emails before they decided it would be faster to switch to a different platform to

communicate. After exchanging usernames for Kik[2]—the platform that they chose—they continued to exchange messages and pictures for "most of an afternoon and evening." Maddox testified that he was the author of all of "Emily's" communications. He described that during the communications, "Faizan" solicited thirteen-year-old "Emily" to engage in sexual contact and sexual intercourse. "Faizan" also communicated in a sexually explicit manner.

In his last email sent through Craigslist, "Faizan" told "Emily" that his Kik username was "faiz1208." "[F]aiz1208" then contacted "Emily" on the Kik username she provided to him. The message received by "Emily" showed a username of "faiz1208" and a name of "M Faizan." After switching to the Kik platform, "faiz1208's" profile picture was the same picture he had previously sent by email to "Emily." In the Kik messages, "Emily" told "faiz1208" that she was in 7th grade. She explained that she was nervous about what they were going to do and needed to know what to expect. "[F]aiz1208" explained in more detail what he would do and then asked, "Do you want intercourse?" When "Emily" expressed concern about getting pregnant, "faiz1208" explained that he would use a condom and exactly how condoms work. He concluded that discussion by stating, "You will be safe."

After the two had discussed the progression of sexual acts they could engage in when they met, they discussed where to meet. After "faiz1208" told "Emily" that he

---

[2]According to Maddox, "Kik is a mobile app that is used for texting communication, . . . and it also has capabilities for phone and video calls."

lived in Dallas, they decided to meet at a park in Hurst. But immediately after discussing the meeting location and where they could go from there, "faiz1208" asked, "One last thing. Just to make sure you're real. Can we video chat[?] Or just send me video [of] you saying hello." Maddox could not send a video and tried to make excuses for not being able to do so. When "Emily" could not provide what he requested, "faiz1208" responded, "I can't trust you then. It's important." When "Emily" stated that she felt like she could trust him, he replied, "But I'm the one who will be in trouble lol." When a video could not be provided, "faiz1208" asked if "Emily" had a Facebook account and for her name on Facebook. She provided him with a name for Facebook. He told her that his name on Facebook was "Faizan Ansari" and that his Facebook account had the same picture as his Kik account. He sent her a link and told her to click on the link to his account, which was "https://www.facebook.com/muhammadfaizan.ansari." "Emily" did not send a request on Facebook. Communication slowed and then stopped after "Emily" did not follow "faiz1208's" directions.

After the communications ceased, Maddox continued his investigation using the information he had gathered from the emails on Craigslist and the text messages on Kik. He issued administrative subpoenas to the companies he knew Ansari used in online activities, including Kik and Craigslist. Maddox explained that when he sent the subpoena to Kik, he asked "for basic subscriber information, any profile picture, device information, account creation date, and Kik[-]version birth date, user[-]location

6

information including IP addresses, most recent IP addresses, and a historical log of IP addresses." Maddox testified that he received basic subscriber information from Kik that showed an email address of heart.hacker.forever@gmail.com for the person with the username "faiz1208." Kik also provided an IP address log that showed that "faiz1208" was utilizing a specific IP address during the time of the communications between "faiz1208" and "Emily." Maddox explained that the same IP address was used when he was communicating as "Emily" with "faiz1208."

After receiving that IP address from Kik, Maddox used a publicly available IP lookup service and determined that the IP address was issued by Charter Communications. To follow up, he sent a subpoena to Charter for information on the IP address as of March 14, 2018, at 22:24:41 UTC. The subscriber information Charter provided for that date and time was Muhammad Faizan Ansari at an apartment in Dallas, Texas. Charter further supplied Maddox with the phone number associated with the account.

Maddox also subpoenaed information from Craigslist related to records for heart.hacker.forever@gmail.com. The information from Craigslist indicated that the relevant email address was used both to post ads and respond to ads. One particular post made from heart.hacker.forever@gmail.com listed a washer and dryer for sale. That post stated that anyone interested in purchasing the items could call or text "Faizan," who lived in Dallas, at the same phone number supplied by Charter. Maddox considered the phone number to be important to his investigation because

7

"[i]t indicates that the same contact information is provided for the Craigslist account that was used to respond to [his] original ad [and is] the phone number that appears on the records of the internet subscriber where the IP address originate[d]."

Maddox further investigated the person he had been communicating with by obtaining the driver's license photo and information for Ansari, who lived at the address provided by Charter. The driver's license photo was admitted without objection. Maddox identified the person in the photo as the same person depicted in the photo emailed by "Faizan" in response to the Craigslist ad as well as the profile photo of the Kik account that Maddox communicated with. Maddox also testified that the address on the driver's license was the same address provided by Charter and that the birthday showed that he would have been twenty-five years old when the communications were taking place.

Maddox then prepared an arrest warrant for Ansari for the offense of online solicitation of a minor and presented it to a judge. The judge found there was probable cause to issue the warrant and signed it on May 3, 2018. The warrant was sent to the fugitive unit of the Fort Worth Police Department.

Officer Martin King testified that on May 21, 2018, he was assigned to the fugitive unit of the Fort Worth Police Department. He explained that on that date, he and his team were looking for Ansari because they had a warrant for his arrest on the charge of soliciting a minor. He described how he first searched databases to confirm the address for Ansari in Dallas. Once confirmed, he went to that location and "set

8

up on the apartment." He had Dallas police presence staged nearby in case the fugitive "got mobile and left," and then he waited for his team to arrive. Once that happened, King and his team went to the apartment, knocked on the door, and identified themselves as law enforcement. He stated that they did that "as loud as [they could]" and that they announced themselves in that manner for their safety, the target's safety, and the safety of everyone on the property. He explained that there was no answer when they knocked on the apartment door and that they just waited for a period of time. When no one answered, they used a key obtained from management of the complex to unlock the door and enter the apartment. While the team was clearing the apartment, the suspect finally responded to them, and they determined he was locked in a bathroom. Ansari refused to unlock the door, and King described how he used force to "pop the door." Ansari was then taken into custody. King identified Ansari in open court as the man arrested that day. King testified that while he was still at the apartment, he spoke to Maddox by phone. After that conversation, King seized a laptop and a cell phone found in the apartment and took those devices to Maddox personally.

Maddox asked James Willingham, a civilian employee with the Fort Worth Police Department who worked in the digital forensics lab, to analyze the devices that were seized. The items were delivered to the lab.[3] Willingham was accepted without

---

[3]Willingham also referred to a search warrant that he received and used to guide his retrieval of relevant information.

objection as an expert in his field of digital evidence. His explanation concerning IP addresses was very similar to Maddox's. However, Willingham analogized them to phone numbers:

> [I]t's essentially, an easy way to think of it is, a phone number for every device on the internet.
>
> When you have a particular device and you're talking to the internet, the internet needs to know who you are . . . . The bottom line is . . . you have a number that is unique on the internet. That's how it knows where to send the data. So essentially, it's the phone number to your device . . . .

Willingham testified that he found "a lot of data on the computer" taken from Ansari's home, including internet histories and a variety of user files. He then described his process of creating a spreadsheet detailing the data he found on the laptop. In this instance, that included the internet history from the computer. When asked if there was a listed username on the computer he examined, he replied that "the name Ansari was in numerous places on the computer." Summing up his role, Willingham stated, "[M]y job is to do the technical recovery . . . and leave the evidence for the detective to evaluate." Maddox then reviewed the data retrieved and found that the internet history showed that the computer seized from Ansari's apartment had been used to access the Craigslist ad that Maddox created on the date the communications were occurring.

The trial court heard testimony outside the presence of the jury concerning the thirty emails exchanged in response to the Craigslist ad and the nineteen text messages

on Kik. Ansari argued outside the presence of the jury that the emails were not relevant and that the State had failed to prove the authenticity of the communications. The trial court "conditionally" overruled the objections to the communications and specified that they were not yet admitted for all purposes, thereby allowing the State to produce evidence before the jury that met the threshold level of proof for authenticity.

During Maddox's testimony before the jury concerning the evidence tying the communications to Ansari, the State again offered for all purposes the thirty emails exchanged in response to the Craigslist ad. Ansari made no additional objections but reasserted his objections made outside the presence of the jury. The trial court overruled those objections and admitted the thirty emails for all purposes. After additional questioning of Maddox, the State also offered the nineteen text messages from Kik into evidence. Ansari urged the same objections he made to the emails, and the trial court overruled those objections and admitted the nineteen Kik messages for all purposes.

Ansari's father testified during the defense portion of the guilt-or-innocence phase of the trial. He told the jury that he was living with his son at the apartment in Dallas in February of 2018 when the apartment was burglarized. He testified that his son's silver Apple laptop was stolen. He said the burglary was reported to the police. He described how a woman he knew, named Marina, came into the convenience store he worked in months later and tried to sell him the stolen laptop for $50. He testified

11

he told her that he recognized the laptop and that if she did not give it to him, he would call the police. He said her response was to run away and leave the computer. Ansari's father testified that the computer was returned to his son on the same day they "were raided by the police." He later acknowledged that was the same day his son was arrested. Ansari also testified that his apartment was burglarized on February 12, 2018, and his laptop stolen. He testified that the laptop was returned to him in early May and that his father was "mistaken" when he testified that it was returned on May 21, 2018, when he was arrested.

The jury found Ansari guilty of two counts of online solicitation of a minor under fourteen years old. Ansari elected to go to the trial court for punishment. The trial court assessed his punishment for each count at ten years' confinement in the Institutional Division of the Texas Department of Criminal Justice and ordered that the sentences be suspended and Ansari placed on community supervision for ten years on each count. The trial court also ordered a $2,000 fine on count one that was not suspended. Ansari appealed.

## II. ADMISSION OF ELECTRONIC COMMUNICATIONS

To properly authenticate a piece of evidence, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Tex. R. Evid. 901(a); *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012). "Whether the proponent has crossed this threshold as required by Rule 901 is one of the preliminary questions of admissibility contemplated by Rule [of Evidence] 104(a)."

*Tienda*, 358 S.W.3d at 637–38. The trial court's responsibility is to make a threshold determination that the proponent of the evidence has supplied facts sufficient to support a reasonable jury determination that the proffered evidence is authentic. *Id.* at 638; *see Butler v. State*, 459 S.W.3d 595, 600 (Tex. Crim. App. 2015). We review a trial court's threshold determination of authenticity under an abuse-of-discretion standard. *Butler*, 459 S.W.3d at 600; *see De La Paz v. State*, 279 S.W.3d 336, 343–44 (Tex. Crim. App. 2009) (stating that appellate courts review trial court's evidentiary rulings for abuse of discretion). Ultimately, the jury must decide whether an item is what the proponent claims it is. *Butler*, 459 S.W.3d at 600.

The exhibits in issue in this case are all electronic communications—emails and social-media posts. In the context of these types of communications, the authentication issue that generally arises is whether the evidence is sufficiently linked to the purported author. "[A]s with the authentication of any kind of proffered evidence, the best or most appropriate method for authenticating electronic evidence will often depend upon the nature of the evidence and the circumstances of the particular case." *Tienda*, 358 S.W.3d at 639.

Ansari argues on appeal that the State did not produce sufficient evidence to prove that the emails and the Kik messages were sent by him. In doing so, he relies exclusively on *Butler* to support his position that the exhibits were improperly admitted. 459 S.W.3d at 595. Specifically, Ansari suggests that because no one saw him send the messages and there was no witness to associate his cell phone number to

13

the messages, the evidence was insufficient to authenticate the emails or the Kik messages. But *Butler* recognizes that authentication "can be accomplished in myriad ways, depending upon the unique facts and circumstances of each case." *Id.* at 601. Evidence can be authenticated through the testimony of a witness with knowledge, evidence of distinctive characteristics, or by circumstantial evidence. Tex. R. Evid. 901(b)(1) (testimony of a witness with knowledge), (b)(4) (distinctive characteristic and the like); *Butler*, 459 S.W.3d at 602 ("[A]uthenticating evidence may be direct or circumstantial."). Yet, Ansari argues there was "no evidence establishing that [he] was the person engaging in a conversation with Detective Maddox."

Ansari's argument is simply incorrect. Maddox painstakingly traced identifying information tying Ansari to the emails and text messages in question through administrative subpoenas, internet searches, and other investigative methods yielding Ansari's physical address, IP address, email address, Kik username, phone number, date of birth, and driver's license photo. Each of these items individually and as a whole traced back to Ansari. Ansari's username on Craigslist was "Faizan." The IP address provided by Kik was the same IP address used by "faiz1208" and was used to communicate with Maddox on Kik. The Kik username also contained 1208, which Maddox explained had personal significance to Ansari. The email address obtained from Kik matched the email address used to post and respond on Craigslist and connected the phone number provided by Charter to the phone number used in a post on the Craigslist account. In his last Kik message to "Emily," "faiz1208" sent a

14

link to his Facebook account that contained his full name of "muhammadfaizan.ansari." The photo of the responder to Maddox's ad on Craigslist matched both the photo on Kik and Ansari's driver's license photo. "Faizan" described himself to "Emily" as twenty-five years of age and living in Dallas. His driver's license also confirmed this information to be correct.

Ansari was arrested at the physical address that was listed in the subscriber information provided by Charter. Ansari did not answer the door when the police announced their presence at that address and was found by the officers locked in a bathroom. An officer had to use force to open that door. Ansari's laptop computer was seized and later searched pursuant to a warrant. The internet history showed that the computer seized from Ansari's apartment was used to access the Craigslist ad created by Maddox on the date the communications were taking place between the responder to the ad and "Emily."

This is ample direct and circumstantial evidence—with all of the individual, particular details considered in combination—to support a prima facie case that would justify admitting the emails from Craigslist and the text messages from Kik to allow the jury to consider and decide the ultimate question of authenticity. *See Tienda*, 358 S.W.3d at 647 ("In performing its Rule 104 gate-keeping function, the trial court itself need [only] be persuaded that the . . . evidence has supplied facts that are sufficient to support a reasonable jury determination that the evidence . . . is

authentic."); *Hines v. State*, 608 S.W.3d 354, 367 (Tex. App.—Houston [1st Dist.] 2020, no pet.).

While it is true that Ansari and his father testified that the computer had been stolen at a point in time, they disagreed as to when the computer was returned. Nevertheless, there was some evidence for the jury to consider suggesting that the computer may not have been in Ansari's possession during the relevant time period. "The jury acts as the sole judge of the credibility of the witnesses and may choose to believe all, some, or none of the testimony presented." *Garcia v. State*, 667 S.W.3d 756, 762 (Tex. Crim. App. 2023); *Barker v. State*, No. 02-22-00255-CR, 2023 WL 2536762, at *1, *5 n.8 (Tex. App.—Fort Worth Mar. 16, 2023, pet. ref'd) (mem. op., not designated for publication). This alternate scenario suggested by Ansari's evidence was one for the jury to assess in its ultimate determination of whether the electronic communications were authored by him. *See Tienda*, 358 S.W.3d at 646. The jury's verdict reflects that it rejected the proffered defense.

"The trial court's determination of whether the proponent has met [the] threshold requirement is subject to appellate review for an abuse of discretion and should not be countermanded so long as it is within the zone of reasonable disagreement." *Butler*, 459 S.W.3d at 600. The trial court's decision to admit the emails and Kik messages and leave the ultimate question of authenticity to the jury was well within the zone of reasonable disagreement. Therefore, the trial court did not err in admitting the electronic evidence. We overrule Ansari's first point.

## III. SUFFICIENCY OF THE EVIDENCE

Ansari summarizes his second point as follows:

> If [a]ppellant's objections had been sustained by the trial court in [a]ppellant's [f]irst [p]oint of [e]rror, then the evidence would be legally insufficient to support [a]ppellant's conviction for online solicitation of a minor.

He goes on to argue that if the electronic evidence had been properly excluded, a rational jury would not have had sufficient evidence to convict him.

Federal due process requires that the State prove beyond a reasonable doubt every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 2787 (1979); *see* U.S. Const. amend. XIV. In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson*, 443 U.S. at 316, 99 S. Ct. at 2787; *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622.

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman*, 520 S.W.3d at 622. We may not reevaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences

are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Id.* at 448–49. The standard of review is the same for direct- and circumstantial-evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016).

"Contrary to the methodology suggested by appellant, when conducting a []sufficiency review, this [c]ourt considers all evidence in the record of the trial, whether it was admissible or inadmissible." *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999); *see Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013). While Ansari does not seem to argue that his sufficiency-of-the-evidence argument applies if the electronic evidence was properly admitted, in an abundance of caution, we will still address the issue. We are bound to consider all of the evidence submitted, including the electronic evidence, and having done so, we hold that Ansari's argument fails.

In the first count of the indictment, Ansari was charged with online solicitation of a minor as follows:

> That Muhammad Faizan Ansari, hereinafter called defendant, on or about the 14th day of March 2018, in the County of Tarrant, State of Texas, did then and there over the internet, by electronic mail or text message or other electronic message service or system, or through a commercial online service, knowingly solicit a minor, W. Maddox, to

18

meet another person, including the defendant, with the intent that W. Maddox will engage in sexual contact, sexual intercourse, or deviate sexual intercourse with the defendant.

In the second count of the indictment, Ansari was again charged with online solicitation of a minor:

> that the defendant in the County of Tarrant and State aforesaid on or about the 14th day of March, 2018, did with intent to commit indecency with a child and/or aggravated sexual assault over the internet, by electronic mail or text message or other electronic message service or system, or through a commercial online service, intentionally communicate in a sexually explicit manner with a minor, W. Maddox, an individual whom the defendant believed to be younger than 14 years of age, and the defendant was 17 years of age or older at the time of the offense.

*See* Tex. Penal Code Ann. § 33.021(b), (c). A "minor" is someone younger than seventeen years of age or someone whom the defendant believes is younger than seventeen years of age. *Id.* § 33.021(a)(1). It is not a defense that the meeting did not occur. *Id.* § 33.021(d).

In his second point, Ansari again argues that "[t]he lone issue contested at trial was identity." Based on the same evidence and testimony produced by the State that satisfied the State's burden to authenticate the electronic communications and from which the jury decided that the emails and text messages came from Ansari, we determine that a rational factfinder could have found the essential elements of the offense as alleged in both counts one and two beyond a reasonable doubt. *Jackson*, 443 U.S. at 316, 99 S. Ct. at 2787; *Queeman*, 520 S.W.3d at 622.

19

Based on the combined and cumulative force of all the above-described evidence and any reasonable inferences therefrom, we hold that the jury was rationally justified in finding Ansari guilty beyond a reasonable doubt of both counts of online solicitation of a minor. We overrule Ansari's second point.

## IV. CONCLUSION

Having overruled both of Ansari's points on appeal, we affirm the trial court's judgment.

/s/ Lee Gabriel

Lee Gabriel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: August 31, 2023